## PETTEWAY v. McINTYRE.

(Filed December 2, 1902.)

1. AGENCY—*Contracts.*

The contracts stated in this case constitute, as a matter of law, the relation of principal and agent.

2. AGENCY—*Contracts—Questions for Jury—Harmless Error.*

Where certain contracts, as in this case, constitute, as a matter of law, the relation of agency, the submission of the question of agency to the jury, is harmless if the jury finds that the relation exists.

ACTION by Charles A. Petteway against T. A. McIntyre and another, heard by Judge *O. H. Allen* and a jury, at October Term, 1901, of the Superior Court of ONSLOW County. From a judgment for the plaintiff, the defendants appealed.

*Meares & Ruark, Duffy & Koonce,* and *W. D. McIver,* for the plaintiff.
*Rountree & Carr,* for the defendants.

MONTGOMERY, J.   On the 29th day of October, 1897, the Parmalee-Eccleston Lumber Co., of New Jersey, a corporation, and Ernest V. Baltzer, of Wilmington, N. C., entered into a paper writing which is called by the parties thereto a lease.   It consists of nine pages of closely printed matter. In it, it was recited as a part of the preamble that the company owned a valuable mill plant for the manufacture of lumber, at Jacksonville, Onslow County, North Carolina, together with valuable standing timber, timber options, timber rights and privileges, and logs, in the counties of Onslow and Jones, North Carolina, and that Baltzer was desirous of

cutting, logging and hauling the timber and of manufacturing the same and the logs; and for that purpose, by himself and in conjunction with others, was ready to operate the mill and undertake the lumbering operations.

In the paper writing, it was also recited that Baltzer had entered into an agreement with Enoch Ludford to operate the same mill plant and to cut, log and haul the timber referred to, and to manufacture it into merchantable lumber, upon the terms and conditions in that contract with said Lunford fully set forth. A copy of that contract was annexed and made a part of the contract between the Parmalee-Eccleston Company and Baltzer. It was also recited in the preamble that Baltzer had entered into an agreement with Horace M. Dickford, of Boston, for the sale of the lumber manufactured as aforesaid, upon commission, a copy of which contract was annexed and also made a part of the contract between the company and Baltzer. It was also recited that in order to carry out the provisions of all the instruments and agreements above referred to, it would be necessary to purchase rail for a log railroad, and a locomotive and log cars, and to repair and place in proper condition, as in the contract with Ledford set forth, the mill and plant at Jacksonville.

After those recitals in the premises, it was declared: "Now, therefore, in consideration of the premises, and for the recitals hereinafter set forth, this indenture witnesseth, that the said, the Parmalee-Eccleston Lumber Company, has leased, and by these presents does grant, demise and lease unto Ernest V. Baltzer all those certain premises situate, lying and being at Jacksonville, Onslow County," etc. The property embraced in the contract, the mill plant, all its fixtures and appurtenances, and all the standing timber in Onslow and Jones counties, and their timber rights.

Baltzer was authorized, "upon payment of such stump-

age or other charges as the said Parmalee-Eccleston Lumber Company itself was under contract to make, and such charges and disbursements only to cut and remove all standing timber and logs thereon, and to convert and manufacture the same into lumber, and without any further costs than aforesaid to said Baltzer, to exercise all the privileges and authority which the company owned and had, or may hereafter acquire, to any railroad or railroads, and upon or over the rights of way now owned or controlled by the said company, appurtenant to, or used by or in connection with, the said mill at Jacksonville aforesaid, and also the privilege of cutting timber for railroad ties and construction, or for other railroad or mill or logging purposes, and of laying, using, operating, maintaining, taking up and removing such rail and railroad from time to time, as its best interest may, in his judgment, require, and any railroad constructed by said Baltzer, and all materials entering therein, whether obtained from rights of way of said company or from its lands or elsewhere, shall be and remain the absolute property of said company, its legal representatives and assigns, and subject to its or their exclusive domination and control for all purposes, to the same extent as though the same, and all parts thereof, were upon land the property of it or them in fee simple; which said assignment and transfer of timber rights and right to manufacture logs into lumber as aforesaid shall be, however, only for the term of the lease aforesaid, and to terminate with the expiration of said lease, and which indenture of lease and assignment as aforesaid is made for and in consideration of the yearly rent or sum of one dollar, payable annually on the 31st day of December in each and every year of said term; as an additional rent, the said Baltzer, for himself, his legal representatives and assigns, agrees that he will promptly, and not less often than once in each month, turn over and deliver to the said Parmalee-Eccleston Lumber Company, or its assigns, the net

proceeds and profits of the business to be conducted under the instrument described in the recitals hereto (copies of which are hereto annexed), and under this instrument, less only such sum or sums of money as shall be necessary to pay the premiums for fire and boiler insurance on said mill plant and its appurtenances and stock on hand, and that he will not apply any portion of the same to any other use or purpose, except by and with the express consent of said company or its assigns.  By the term 'net proceeds,' as used in this paragraph, is meant the gross amount of all moneys received from the manufacture and sale of lumber out of the timber hereinbefore referred to, less the following: (a) Amounts due Ledford under his contract as therein set forth.  (b) Amounts due Dickford under his contract, therein set forth.  (c) Costs of inspections, clerk hire, stationery, postage, traveling, and the like, necessary to the due prosecution of the business and the preservation of its best interests.  (d) Amount of stumpage necessarily paid by Baltzer, being at the same rate as now contracted for by the Parmalee-Eccleston Lumber Company.  The remainder of surplus of income, after deducting the foregoing, shall be the 'net proceeds,' as the term is used and understood in this instrument, and shall be paid over by said Baltzer to said company or its assigns, as rental for said premises, except only as the same is ultimately subject to fire insurance premiums as aforesaid, and to Baltzer's contingent interest therein by way of additional compensation, as hereinafter appears."

The additional compensation to Baltzer provided for in the contract is in these words: "The Parmalee-Eccleston Lumber Company, for itself, its successors and assigns, agrees that for his labor and services in fulfilling his obligations under the provisions of this lease, the said company will, during the term of this lease, except as herein provided, pay said Baltzer the yearly sum of $1,500, in equal monthly instalments, com-

mencing with the day of the date hereof, and in addition to this amount, at the close of each year, will pay him the further sum equal to ten per cent of the net proceeds and profits of the business to be conducted as aforesaid. The said company in like manner also agrees that it will cause to be given to said Ludford a sufficient bond in the penal sum of five thousand dollars, conditioned for the faithful performance by said Baltzer of his said contract with said Ludford."

Certain other provisions of the contract were that the company was to furnish the locomotive, log cars and rail, and the necessary bolts and fastenings and switches with which to build and equip the log railroad, and the sum of $2,500, with which to put the mill in order. Baltzer, on his part, among other things, contracted to give his personal services to placing the mill in proper condition for operation, and to aid in securing rail for hauling timber as fast as the same might be needed, and the rolling stock necessary to haul the timber. And he further agreed "to cut, log and haul the same, and to manufacture it into lumber to his best interests under the terms of this lease, and to dispose of the same at the best prices which he can obtain, of the reasonableness, however, it is mutually agreed, he is to be the sole judge." The time mentioned in the paper writing, called the lease, during which the term shall last, was from its date, 29th October, 1897, to December 31, 1900. At the expiration of which term, or earlier determination for any cause whatsoever, Baltzer, or his legal representatives, would quit and surrender the premises in as good state and condition as reasonable use and wear thereof would permit, damages by the elements excepted.

The contract between Baltzer and Ludford, made a part of the contract between the Parmalee-Eccleston Company and Baltzer, stipulated that Baltzer would put in good condition the mill and all its appurtenances, and would turn over and lease, for the space of three years after the execution of the

contract, it having been entered into on the 19th October, 1897, all the mill property and appurtenances of the lumber company; and he also agreed to furnish to Ludford the locomotive and the log cars, and the necessary rails and spikes and bolts sufficient to operate a log road or roads for the purpose of procuring timber for the mill under the contract, and to lease the property so purchased upon the terms set forth in the agreement at a nominal rent.   Ludford agreed to construct and operate, at his own expense, the logging roads, Baltzer furnishing the cross-ties, they to be gotten out by Ludford.

It was further agreed that Baltzer was to furnish Ludford with all the standing timber, together with the rights of way now owned by the Parmalee-Eccleston Lumber Company in Onslow County, and such as should be sufficient to operate the plant during the term of the contract.

Ludford agreed further to cut and transport from the forest to the mill all timber of merchantable quality on the property of the company, which Baltzer was allowed to cut under his contract with the company, under the directions of Baltzer; and he further agreed to saw the logs, kiln dry, rip dress and assort the lumber, in accordance with the orders of Baltzer, and to place the lumber manufactured by him under the contract in the rough and dressed lumber sheds in proper order, as he might be directed to do by Baltzer; and he was to have the lumber put upon the cars, or place it in bins furnished by Baltzer for that purpose, according to the order of Baltzer.   For his compensation, Ludford was to receive six dollars per thousand feet for board measure for kiln-dry lumber, dressed according to the order of Baltzer and loaded on the railroad cars at the mill, and four dollars and fifty cents per thousand feet for rough kiln-dried well manufactured lumber, according to the orders of Baltzer.

On the same day that the contract between the Parmalee-Eccleston Lumber Company and Baltzer was executed, the

company and the defendant McIntyre entered into the following contract (Exhibit "D") : "Whereas, the Parmalee-Eccleston Lumber Company has this day entered into an agreement, of which the foregoing is a copy and duplicate; and whereas, the said company is not at present in funds to meet its obligations thereunder, and at the same time is anxious to obtain the benefits to be derived therefrom to its mill plant and machinery, and in this way to realize upon its timber rights referred to in the foregoing agreement; and whereas, the said company is already heavily indebted to Thomas A. McIntyre, of the city, county and State of New York, for past advances: Now, therefore, this indenture witnesseth, that the said Parmalee-Eccleston Lumber Company, for and in consideration of the premises, and of the sum of one dollar lawful money of the United States, to it in hand paid by the said Thomas A. McIntyre, at or before the unsealing and delivery of these presents, the receipt whereof is hereby acknowledged, hath granted, bargained, sold, assigned, transferred and set over, and by these presents doth grant, bargain, sell, assign, transfer and set over unto the said Thomas A. McIntyre, his executors, administrators and assigns, the said indenture of lease, together with all the rights, privileges, rents, moneys and emoluments of whatsoever kind, nature or extent accruing from said lease to the said Parmalee-Eccleston Lumber Company, and all the estate, right, title, interest, term of years yet to come and property, claim and demand whatsoever of the said Parmalee-Eccleston Lumber Company in and to the said lease—

"To have and to hold the same to him, the said Thomas A. McIntyre, his heirs and assigns, as fully and in as ample a manner as the said Parmalee-Eccleston Lumber Company, its successors and assigns, might hold and enjoy the same, and not otherwise:

"And the said, the Parmalee-Eccleston Lumber Company,

for itself, its successors and assigns, hereby authorizes and empowers the said Thomas A. McIntyre, his heirs, executors, administrators and assigns, to take and apply to his own or their own use, the sum or sums provided therein as rental, and whatever property and moneys accrue to or from said company or its assigns under the terms of said lease, whenever the same shall be due or receivable, and to take and pursue all steps and means for the recovery of said rent or other property as by law are provided, as fully to all intents and purposes as the said, the Parmalee-Eccleston Lumber Company, its successors or assigns, might or could do in the premises.

"And it is mutually agreed between the parties hereto that the steel rails, locomotive, rolling stock and other appurtenances in said lease agreed to be furnished by the party of the first part thereto, shall be and remain the property of the said Thomas A. McIntyre, until said Thomas A. McIntyre is fully repaid, by the receipt of the proceeds of the said agreement or otherwise, the amount of money advanced heretofore, or in consequence of this agreement, to, for or on account of said company's interest. And the said Thomas A. McIntyre hereby covenants and agrees to and with the said Parmalee-Eccleston Lumber Company to do and perform all the terms and condtions of the said foregoing lease agreement upon the part of the said Parmalee-Eccleston Lumber Company, contracted to be done and performed."

And on the said 29th day of October, 1897, McIntyre and Baltzer entered into the following agreement:

"Agreement made and entered into this 29th day of October, 1897, by and between Thomas A. McIntyre, of the city, county and State of New York, and Ernest V. Baltzer, of Wilmington, North Carolina:

"Whereas, the said Baltzer, by a certain instrument in writing, bearing even date herewith, has entered into an

agreement of lease with the Parmalee-Eccleston Lumber Company, a corporation duly existing under and by virtue of the laws of the State of New Jersey, doing business at Jacksonville, North Carolina, a copy of which contract is hereto annexed and made a part thereof; and

"Whereas, said Baltzer, by virtue of the power conferred upon him under said agreement of lease, has entered into an agreement with one Enoch Ludford to operate the mill plant of the said Parmalee-Eccleston Lumber Company at Jacksonville, North Carolina, aforesaid (except gang and circular saws), and to cut, log and haul the timber referred to in the said agreement of lease, and to manufacture said timber into merchantable lumber, upon the terms and conditions in said contract with said Ludford fully set forth, a copy of which contract is also hereto annexed and made a part hereof; and

"Whereas, said Baltzer, by virtue of the power also conferred upon him under his agreement of lease with said the Parmalee-Eccleston Lumber Company aforesaid, has entered into an agreement with one Horace M. Bickford for the sale of the lumber manufactured as aforesaid, upon commission, a copy of which contract is also hereto annexed and made a part hereof; and

"Whereas, the said, the Parmalee-Eccleston Lumber Company, has assigned to Thomas A. McIntyre the said agreement of lease and all the profits arising thereunder, and the said Thomas A. McIntyre has assumed all the obligations in said agreement of lease specified to be performed by the said company:

"Now, therefore, in consideration of the premises and of the terms and provisions of this instrument as hereinafter set forth, and of the sum of one dollar by each of the parties in hand duly paid,

"The parties hereto mutually covenant and agree as follows:  ·

"(1) That said Thomas A. McIntyre will do and perform all the terms and conditions as said indenture of lease specified to be done and performed by the Parmalee-Eccleston Lumber Company.

"(2) That the said Ernest V. Baltzer will do and perform all the terms and conditions, labor and services in said lease specified to be done and performed by him.

"(3) That the said McIntyre will hold the said Baltzer harmless against and from any and all lawful claims or damages which he may suffer as contractor with said Ludford and Bickford, and the Parmalee-Eccleston Lumber Company, or either of them, or which he may suffer by the termination of either or both the Ludford and Bickford contracts, as in said indenture of lease specified; but this guarantee shall not be construed to cover the result of any default or neglect on the part of the said Baltzer.

"And whereas, it is declared in and by the agreement of lease referred to in the first recital hereof, that in case of the death or failure from any cause on the part of Baltzer, the said agreement of lease should not thereby lapse or determine, but that it should immediately inure to the benefit of such person and his assigns as said Baltzer may designate in writing.

"Now, therefore, I, the said Ernest V. Baltzer, in the event aforesaid, do hereby designate Thomas A. McIntyre and his assigns, as the person to whom shall inure the rights, privileges, powers, property and rights of property of every name, nature and kind, with all the responsibilities and subject to all the terms and conditions of said instruments as therein respectively set forth and expressed.

"Except as otherwise provided herein specifically, the terms and provisions of this agreement shall bind and inure to the heirs, executors, administrators and assigns of the parties hereto.

"In case any further or other instruments should be found requisite for the more completely carrying into effect any of the provisions of this agreement, then the parties hereto will execute the same upon demand."

The plaintiff brought this action in a justice's court to recover from the defendant McIntyre an amount alleged to be due on a contract with Baltzer in his operation of the mill plant, alleging that Baltzer was either the agent of McIntyre or a partner with him in the business. The defendant denied that he was either the principal of Baltzer or a partner with him in the milling business. From the justice's judgment in favor of the plaintiff, the defendant appealed to the Superior Court. There was a judgment in that court for the plaintiff.

If those portions of the contract which we have recited and referred to, and which relate to the acts to be done by the several parties thereto, constituted the whole of those contracts, we would even then not be sure that there was not some evidence going to show a partnership between McIntyre and Baltzer. There are other parts of those contracts, though, limiting and narrowing the duties, rights and privileges of Baltzer, which we will presently notice and discuss, and which, when read with the whole of all of the contracts, satisfy us, as a matter of law, that Baltzer was the agent of McIntyre for the purpose of conducting the business mentioned in the contracts. Notwithstanding the agreement between the lumber company and Baltzer was called a *lease*, yet, through it all can be seen with perfect distinctness the guiding and controlling hand of the company in the management of the business.

No experienced business man, upon reading the four contracts mentioned above, could fail to see that Baltzer was so hampered and embarrassed by the limitations and restrictions of the contract as to be left little of independence, or of judgment, or of action. It seems clear that the purpose of

the draftsman of the agreements was to enable the company
and McIntyre to conduct the hazardous enterprise of saw
milling through an agent under the forms of a lease of the
property to Baltzer. Baltzer was not allowed to keep, in his
own possession, the original of the agreement with the com-
pany, the original of the agreement with Dickford, the origi-
nal of the agreement with Ludford, or the original of the
agreement with McIntyre. He was to assign and deposit
them with the company, and he was required, further, to as-
sign and deposit with the company all bonds and undertak-
ings which might be delivered to him for the faithful per-
formance of the contracts. Baltzer further covenanted with
the company not to dispose of any right he had under the
contracts to any one without the company's permission—the
covenant being in the following language: "Baltzer cove-
nants and agrees not to assign or otherwise dispose of any of
the contracts, nor this lease, nor any of his rights under them,
or either of them, nor of this instrument, nor of any of his
rights hereunder, to any person, firm or corporation whomso-
ever, excepting by and with the consent, in writing, of said
company or its assigns, and excepting as provided in the terms
of the contracts, copies of which are annexed." He also
agreed that in case of his death, the lease should not go to his
personal representatives. The following is a provision in the
contract in reference to that matter: "In case of the death of
said Baltzer, this lease shall not thereby lapse or become de-
termined, but shall immediately inure to the benefit of such
person or his assigns as said Baltzer may have designated in
writing." And he further agreed to assign, and did assign,
to the company the right to annul the contract whenever the
company saw fit to do so. The language used on that point
is as follows: "Baltzer further agrees to, and does hereby as-
sign, transfer and set over unto said company, or its assigns,
his (said Baltzer's) right to terminate said Ludford and

Dickford contracts, or either of them, or their substitutes, as conferred upon him by the terms of said contracts respectively, and upon the conditions therein expressed, said company hereby agreeing, should it avail itself of such privilege, to pay said Baltzer at the agreed rate of $1,500 per annum for the remainder of the year after such termination, and also his additional compensation, as hereinbefore set forth, down to the time of such termination." He had reserved the right in his contract with Ludford to end the contract with him upon three months notice. Baltzer's contract with Ludford, notwithstanding it purported to be a lease of the whole plant, yet, when carefully examined, Ludford had very little power and no discretion. He had to cut the lumber under Baltzer's direction, to saw it under his direction, to pile and load it under his direction, and was compelled to abandon his contract whenever Baltzer demanded it. Indeed, only two roms of the office building of the plant were to be given to Ludford, and in that contract there was reserved, for the use of the lumber company, access to the office building at all times. The language of the contract on that point was as follows: "The party of the first part reserves to itself and easement for access, for its officers or agents, to and from all parts and portions of the above described property, at all times." It is evident from that language that, in the draftsman's mind, the company was to be the directing power in the management of the business. The presence of its officers and agents at all times upon premises which had been leased and put in the possession of the lessee, is incompatible with the idea of a *bona fide lease.*

The defendant McIntyre received, as we have seen, an assignment of this contract between the lumber company and Baltzer, and is affected in law by the several contracts mentioned, just as the lumber company was. In the contract between McIntyre and Baltzer, made after the assignment by

the lumber company of its interest of what is called the lease
to McIntyre, Baltzer covenants with McIntyre, among other
things, as follows: "And whereas, it is declared in and by
the agreement of lease referred to in the first recital hereof,
that in case of the death or failure from any cause on the part
of Baltzer, the said agreement of lease should not thereby
lapse or determine, but that it should immediately enure to
the benefit of such person and his assigns as said Baltzer may
designate in writing: Now, therefore, I, the said Ernest V.
Baltzer, in the event aforesaid, do hereby designate Thomas
A. McIntyre, and his assigns, as the person to whom shall
enure the rights, privileges, powers, property and rights of
property of every name, nature and kind, with all the re-
sponsibilities and subject to all the terms and conditions of
said instruments, as therein respectively set forth and ex-
pressed." McIntyre, under that agreement, got the benefit
of the covenant which Baltzer had made with the lumber
company, that in case of his death the lease should not lapse,
but should immediately enure to the benefit of such person,
or his asigns, as Baltzer might designate in writing. McIn-
tyre, then, had a right to put an end to the contract, which
was called a lease, and he had also been substituted for Balt-
zer in case of Baltzer's death.

In the brief of the defendant McIntyre, it was argued that
if Baltzer was an agent, he was a special agent. But it ap-
pears from the contract that he was authorized to operate the
saw-mill plant, and it is stated in the case on appeal that the
plaintiff's debt was contracted by Baltzer in his operation of
the mill plant.

His Honor submitted one issue to the jury, to-wit, "Are
the defendants indebted to the plaintiff, and if so, in what
amount?" and instructed the jury thereon as follows: "8. If
you shall find that said business was in fact the business of
McIntyre, and that McIntyre had employed Baltzer to con-

duct the same in his own name, and that the work done was within the authority given the said Baltzer by McIntyre, then both Baltzer and McIntyre would be liable, and, if so, answer 'Yes,' otherwise 'No.' " The jury answered in the affirmative and for the sum of $95.92.

As we have said, the contracts in this case, upon their face, constituted, as a matter of law, Baltzer the agent of the lumber company, and then of McIntyre by assignment of the lumber company. His Honor ought not to have submitted an issue as to the agency to the jury, but as he did so and the jury made response as the law of the case was, no harm has been done.

No Error.