FINISHING & WAREHOUSE CO. v. OZMENT.

(Filed June 6, 1903.)

1. REFORMATION OF INSTRUMENTS—*Equity—Mistake.*

A court of equity may correct mutual mistakes in written instruments.

2. EVIDENCE—*Sufficiency of Evidence—Reformation of Instruments—Mistakes.*

The evidence in this case is sufficiently clear, strong and convincing to warrant the correction of the mistake in the deed.

3. REFORMATION OF INSTRUMENTS—*Deeds—Mistakes—Issues.*

In this action for the reformation of a deed for mistake, the issue, set out in the statement of facts, is sufficiently comprehensive.

4. EVIDENCE—*Reformation of Instruments—Mistakes.*

In an action to reform a deed for a mistake, it is competent for a witness to testify as to the intention of the parties.

5. REFORMATION OF INSTRUMENTS—*Mistake—Evidence.*

The mere fact that a tract of land intended to be conveyed was described in the deed as 50 by 150 feet, whereas it in fact contained only 50 by 116 feet, was not evidence of negligence on the part of the grantor, such as to deprive him of the right to reformation.

ACTION by the Southern Finishing & Warehouse Company against W. R. Ozment, heard by Judge *T. A. McNeill* and a jury, at September Term, 1902, of the Superior Court of GUILFORD County.

This is an action to reform a deed. Plaintiff being the owner of a large parcel of land at the southwest intersection of Bessemer avenue and Carolina street, in the city of Greensboro, on which it had erected several buildings in close proximity to each other, the defendant applied to plaintiff for the purchase of a part of said land, known as the storehouse lot, which was then, and had been for some time, occupied by the defendant as tenant of the plaintiff and which

was immediately east of the Combs lot, which also belonged
to the plaintiff, and which was and had been occupied for
some time by one Combs as tenant of the plaintiff. The
store-house lot, according to its true dimensions, fronted fifty
feet on Carolina street and extended back with that width
westwardly along Bessemer avenue 116 feet to a point just
east of a flower house or pit, which stood upon the adjoining
lot, known as the Combs lot, and was used with it. That on
March 19, 1901, plaintiff executed a deed to the defendant
for a part of said land, so owned by it, which was described
in the deed as fronting fifty feet on Carolina street and ex-
tending with that width westwardly along Bessemer avenue
150 feet, which boundaries would include not only the flower-
house or pit, but nearly one-half of the dwelling house on the
Combs lot. There was no reference in the deed to the "store-
house lot" by that name. Neither of the parties knew the
size of the store-house lot at the time the deed was executed,
but there was evidence introduced by the plaintiff which
tended strongly to establish that defendant intended to buy
and the plaintiff to sell no more of the land of the plaintiff
than was embraced within the actual boundaries of the lot
then occupied by the defendant. The plaintiff sold and the
defendant bought that lot and nothing more. After the deed
was made, the defendant never attempted to occupy or use
any part of the Combs lot and never made any claim or de-
mand for any part thereof, but the same continued to be oc-
cupied and used by Mr. Combs and his family. About three
weeks after the deed was executed the plaintiff learned of the
mistake in the deed through one Lindau, its secretary and
treasurer, who had negotiated the sale and conducted the en-
tire transaction in its behalf. Lindau, having heard it re-
ported that the deed by mistake had been drawn so as to cover
a part of the Combs lot, went to see the defendant, who ad-
mitted that the parties had both made a mistake in drawing

the deed and that it really embraced more land than he had bought or that was intended to be conveyed. Defendant further admitted that the deed included thirty-four feet of the Combs lot, which was not purchased by him, and that the correct dimensions of the store-house lot, which was all that he bought, were fifty feet on Carolina street by 116 feet on Bessemer Avenue, and that he was willing that the deed should be corrected so as to convey to him only the store-house lot, but that he did not know whether his wife would consent to do so unless she was paid something for the change in the deed. He promised to see his wife and let Lindau know what she said about it. Shortly afterwards Lindau saw defendant and he told him his wife wanted $100 as a consideration for her joinder in the corrected deed. Plaintiff declined to pay this amount, but its president, Moses H. Cone went to see the defendant and proposed to him that the plaintiff would pay back the consideration ($700) and whatever sum defendant had paid out for improvements and betterments on the property, or, if defendant preferred, he could keep the store-house lot and deed could be reformed. Defendant declined the proposition but admitted in the interview that he had not bought any of the Combs lot and that he had only bought the store house as then occupied by himself. He also stated to Mr. Cone that the western boundary of the store-house lot was just east of the flower pit on the Combs lot, but "he insisted" that, as his deed covered 150 feet, he was going to hold on to it as he had been advised that he could do so, if he desired to be "contrary," unless the plaintiff would give him the $100. One of plaintiff's witnesses, Miss Combs, testified that defendant stated to Moses H. Cone in her presence and hearing, "that he did not think he was getting any part of the Combs house or lot, but he did not know how far it ran; that he did not think the lot he was getting was farther west than the flower pit." She further testified

that the flower pit was on the lot occupied by her father.
There was testimony tending to show that the store-house lot
was a well defined lot with visible marks and boundaries
and it could be well seen to what division line the occupants
of the respective lots had used them.    There were outhouses
on the lots which clearly indicated the boundaries and a
survey showed that the store-house lot was 50 by 116 feet
and that the boundaries as set forth in the deed would take
in one half of the Combs lot.    The defendant in his answer
denied the plaintiff's allegation as to the mistake.    He testi-
fied in his own behalf as follows: "That on March 9, 1900,
he went to the office of the plaintiff and there met the wit-
ness Lindau, who asked him what he could do for him, and
that he answered 'I understand that you want to sell the
store-house and lot,' and he asked me to make him a price—
what I would give, and I said 'I am not pricing your prop-
erty'.    I made him an offer of $700 for 50 feet on Carolina
Street and 150 on Bessemer Avenue.    This proposition was
in writing.    On the 19th March thereafter, or about that
time, the deed was handed me and I paid the $700.    That
the witness had been renting the store-house and lot for some
two or three years before the transaction.    That J. H. Combs
occupied the house and lot immediately west of the store-
house lot.    That the witness did not use any part of the lot
west of the east end of the flower pit; that he did not use
any part of the Combs house and lot, nor was any part of
either rented by him.    That he saw the Combs family using
the flower pit; that witness had not used any part of the
Combs house since making the deed and never made any
claim to any part till after the bringing of this suit by the
plaintiff; and then it was, or soon thereafter, he instituted
the suit in the justice's court, claiming part of the rents of
the Combs house and lot.    That when he bought and took
the deed in controversy he was simply buying the store-house

and lot; that he did not know how large the store-house lot was when he proposed to Mr. Lindau to buy the same, but that Lindau told him it was 50 by 150 feet; the witness had never measured the lot and did not know its size at the time he bought.   That the first time he claimed any part of the Combs house and lot was after he had taken a deed and the lot was measured according to the distances given in the deed, and it was found that the deed covered a part of the Combs house and lot.   Witness would not say positively that he did not say to Mr. Cone in his interview, that he did not think his lot extended back to the flower pit."

The witness Lindau, over the objection of the defendant, testified as follows: "We intended (to sell) the store-house and lot which the defendant had been using for several years." Lindau had testified just before this that he (defendant) never expected to get more than the place he had originally rented and that he intended to buy to a point just east of the flower pit.

Defendant moved, at the close of the testimony, to dismiss the complaint or for judgment as in case of non-suit.   The motion was refused and defendant excepted.

He then tendered the following issues: 1. Was the deed set forth in the complaint made by mutual mistake of both plaintiff and defendant?   2. Were the facts as to the location and description of the land conveyed by plaintiff to defendant equally known to both parties?   3. Were the facts as to the location and description of the land conveyed by the plaintiff to defendant unknown to both parties?   4. Did the plaintiff and defendant each have adequate means of information to ascertain the true location and description of the land conveyed?

The court refused to accept these issues and instead thereof submitted the following issue to the jury:   "Was the 34

feet of the Combs lot included in the deed from the plaintiff to the defendant by mutual mistake of the parties?"

At the close of the evidence, the defendant requested the court to give the following instructions to the jury: 1. If in a contract for the purchase of land either party fails to avail himself of those sources of information readily within his reach and fails to do so in the absence of any fraud or fraudulent representation made by the other party, the maxim of *caveat emptor* applies as it does to personal property and the courts will not aid the purchaser who desires to rescind the contract. 2. A contract made under mistake or ignorance of a material fact is not voidable where the facts are equally known or were unknown to both parties, or where each has equal and adequate means of information, if the party complained of has acted in good faith. 3. That there is no evidence to go to the jury of a mutual mistake between the plaintiff and defendant in this case.

The court refused to give these instructions and the defendant excepted.

The charge of the court was full and in all respects correct and covered the controverted questions and there was no exception to it.

Defendant assigned the following errors: 1. Refusal of his Honor to submit issues tendered by defendant; 2. Admission of Lindau's testimony that he intended to convey only 116 feet. 3. Refusal of his Honor at conclusion of plaintiff's testimony to dismiss the action under the Hinsdale Act. 4. Refusal of his Honor at the close of all the testimony to dismiss the action under the Hinsdale Act. 5. Refusal of his Honor to give the instructions as asked for by the defendant. 6. The judgment of the court.

The jury answered the issue yes and judgment was entered for the plaintiff upon the verdict. The defendant excepted and appealed.

*King & Kimball* and *W. P. Bynum, Jr.,* for the plaintiff.
*John A. Barringer* and *Chas. M. Stedman,* for the defendant.

WALKER, J., (after stating the case) :   The case made out by the plaintiff and reinforced by the testimony of the defendant appeals strongly to the conscience of the court. and it would be strange indeed if any principle of equity could be successfully invoked which would cause us to withhold from the plaintiff the relief which he seeks in this action and enable the defendant to retain a part of the Combs lot which it clearly appears he did not buy and for which, of course, he has paid nothing.   He is insisting upon his strict legal right and the advantage which he has gained by the miscarriage of the parties in writing their real agreement in the deed.

It is true that the defendant starts in the case with a technical advantage, for the law always presumes, nothing else appearing, that a deed has been correctly written and that it is the true expression of the intention and agreement of the parties, and it must stand as it was prepared and executed by the parties, unless this presumption of the law is in some way rebutted, in an action brought to reform the deed, the burden being upon him who seeks to correct it to show by strong and convincing proof and in the clearest and most satisfactory manner that there was a mutual mistake and that the alleged intention of the parties, to which he desires it to be conformed, continued concurrently in the minds of both of them down to the time of its execution, and he must also show precisely the form to which the deed ought to be brought.   This is a familiar principle.   Bispham's Eq., Sec. 469.

It has been said that this rule is founded upon the salutary principle that the parties have agreed upon the writing as the

evidence of the contract between them and as the memorial of
their agreement if any dispute should arise as to its terms and
that the law will not change it "until by a weight of proof
greater than itself a court of equity, in the exercise of a very
high and delicate jurisdiction shall correct it. *Ely v. Early,*
94 N. C., 8. Mr. Adams, in referring to this jurisdiction of
a court of equity says: "In the second case where the instru-
ment purports to carry into execution an agreement which
it recites, and exceeds or falls short of that agreement, there
is no difficulty in rectifying the mistake; for then there is
clear evidence in the instrument itself that it operates beyond
its real intent. If, however, there is no recital of any agree-
ment, but a mistake is alleged, and extrinsic evidence ten-
dered in proof that it was made, the limits of the equity for
correction are more difficult to define. The *prima facie* pre-
sumption of law is that the written contract shows the ulti-
mate intention, and that all previous proposals and arrange-
ments, so fas as they may be inconsistent with that contract
have been deliberately abandoned. It seems however that
the instrument may be corrected, if it is admitted or proved
to have been made in pursuance of a prior agreement, by the
terms of which both parties meant to abide, but with which it
is in fact inconsistent; or if it is admitted or proved that an
instrument intended by both parties to be prepared in one
form, has, by reason of some undesigned insertion or omis-
sion, been prepared and executed in another." Adams Eq.,
p. 343; star p. 169.

But when the party who seeks to rectify the instrument
produces evidence of any material mistake which is clear,
strong and convincing, there is no good reason, and surely
there ought not to be any, why a court of equity should not
exercise its powers, according to established principles in the
correction of the mistake. The remedy by reformation is
obviously one which is necessary to the complete and exact

administration of justice, and which moreover, can be attained by equitable procedure alone.

"Equity will reform a written contract or other instrument *inter vivos* where, through mutual mistake, or the mistake of one of the parties, induced or accompanied by the fraud of the other, it does not, as written, truly express the agreement of the parties." Eaton on Eq., Sec. 618.

In the case of *Newsom v. Bufferlow,* 16 N. C., 381, this court recognized and enforced the right to have a deed corrected upon the ground that it was an executed contract and the plaintiff therefore had no remedy at law, as he might have in the case of some executory contracts, and further that unless a court of equity give relief the plaintiff would have no redress, and the remedy will be applied where a clause is either inserted in a deed, or is omitted, through fraud or mistake. In that case the court refers with approval to *Gillespie v. Moore,* 2 Johns., Ch. 585; 7 Am. Dec., 559, in which it appeared that a deed was executed by mistake for 250 acres of land, when it ought to have been for 200 acres only. The court permitted parol evidence to prove the mistake although it had been positively denied in the answer. It is needless to pursue this discussion further for this court has repeatedly held that the jurisdiction of a court of equity to correct mutual mistakes in deeds and like instruments, when such mistake is admitted or distinctly proven, is clear and unquestionable. *Morisey v. Swinson,* 104 N. C., 555; *Kornegay v. Everett,* 99 N. C., 30.

In this connection we will consider the third and fourth assignments of error, that is the refusal of the court to dismiss the complaint under the statute, at the close of the evidence, and the refusal to charge that there was no evidence of mistake. The court properly refused both requests. The evidence is abundantly sufficient to sustain plaintiff's allegation of a mistake. It was clear, strong and convincing in

character, and the court, in its charge, instructed the jury that plaintiff must have satisfied them by that kind of evidence of the mistake, and unless it had done so, the jury should answer the issue 'no'. How could the evidence be less than strong, clear and convincing when the plaintiff's witnesses testified positively to the mistake and also to the admissions of the mistake by the defendant, which admissions he would not deny when he took the stand as a witness and testified in his own behalf.

But the defendant complains that the court did not submit the proper issues, although requested to do so. We think the issue submitted was sufficiently comprehensive in its scope to enable the defendant to present his defense in all its aspects, and it seems that by appropriate ·prayers for instructions he fully availed himself of this opportunity and privilege, and he suffered no prejudice by the action of the court. *Ratliff v. Ratliff,* 131 N. C., 435. The prayers for instructions were refused, to be sure, but not because they did not come within the scope of the issue submitted to the jury, but because they were not proper in themselves and were not applicable to the peculiar facts of the case. Besides, the second, third and fourth issues as tendered by the defendant should not have been submitted because they were irrelevant to the facts of the case. The first issue tendered was not broad enough, and as far as it did go was embraced within the issue submitted by the court. The testimony of Lindau, as to the intention of the parties, was clearly competent. The question in dispute was as to the intention of the parties in making the deed and any testimony tending to show what it was, especially when it came from one of the parties to the transaction, who must have known that intention, was admissible to show what the parties intended to do and that the deed did not correctly express the agreement, which was the very fact in issue.

The defendant's first and third prayers for instruction were given by the court and the second and fourth refused. We can see no error in this ruling. This is not a case where the principle invoked by these prayers has any application. Both parties were laboring under a wrong impression as to the dimensions of the store-house lot. ·It is clearly established that the parties intended to convey that lot, with reference to its particular boundaries, and no more land than it embraced, and we do not think the mere fact that it was described as containing 50 by 150 feet was any evidence of negligence on the part of the plaintiff which is sufficient to deprive him of equitable relief by the correction of the mistake. It is just that kind of a case where the parties have been thrown off their guard, and for that reason have failed to inform themselves, by a clear misapprehension of both of them as to the dimensions or the boundaries of a lot which was sold by one and bought by the other. The case *Pugh v. Brittain,* 17 N. C., 37 it seems to us, effectually disposes of this exception. In that case the deed described the land conveyed by metes and bounds, and by mutual mistake of the parties it covered land which the vendor did not intend to sell nor the vendee to buy. In reference to the plaintiff's right to a correction of the deed the court said: "It is therefore the opinion of the defendant that the plaintiff conveyed land to him, which neither he nor his brother believed was included in the boundaries set forth in the deed, and which they both knew belonged to another person. The bill is filed to rectify the mistake. But the defendant insists, that as the parties were ignorant of the lines and had not the means of ascertaining them by a survey, the vendor meant to sell and he to purchase all the land described in the deed to the elder Pugh, grandfather of the plaintiff—that he looked to the paper title only. If a person was purchasing another's interest in land in no respect located, there might be some ground for such a claim.

But in this case, the parties had a knowledge of the land sold, but not of its particular boundaries.; for the defendant describes it as low, flat land uncleared and covered with water in the winter. And neither party ever dreamed that Chamberland's land was part of it. For it seems that Bartlett, who claimed under Chamberland, was in actual possession of that land."

But if plaintiff had been negligent, it does not follow that he has lost thereby his right to relief. "Even negligence may not in all cases close the doors of Chancery against a complainant; for if the position of either party had not been changed in consequence thereof relief may be granted." Bispham's Eq., Sec. 192. What change prejudicial to the defendant has taken place since the deed was made? There has been none, except the outlay for improvements or betterments and the plaintiff agreed to repay to him the amount so expended. When he made these improvements he knew according to his own testimony and the admissions which were made by him, that he had not purchased any part of the Combs lot, and therefore made the improvements, it would seem, with full notice of the plaintiff's equity. The plaintiff will no doubt allow him for the money actually expended in the way of betterments, but that is now a matter which must be settled between them. We merely suggest it as a proper course to be taken.

Upon a careful consideration of the whole case we can find no error which was committed by the court in the trial below.

No Error.

DOUGLAS, J., concurring. I concur in the opinion upon the evidence of the defendant himself, who practically admits that he did not think he was buying anything more than the store-house lot. And yet I think this case goes to the verge of

the doctrine. There is no discrepancy between the previous contract and the deed. The defendant did not offer to buy the store-house lot as such. He made a written offer to buy a lot at a designated spot, measuring fifty by one hundred and fifty feet. The deed was made in strict accordance with the written offer. It is true this lot covered the store-house lot, but it was not limited to the store-house lot, certainly not in terms. Both parties thought the lot was one hundred and fifty feet deep, and both parties knew that the plaintiff had the right to convey that much land, as it owned the surrounding land. Strictly speaking there was no mistake either in the written contract or in the deed made in pursuance of the contract. Both papers were written as the parties intended them to be written. The sole mistake lay in the fact that neither party knew the exact depth of the store-house lot, so called; which it seems was all that either party intended to buy or sell. I fully concur in the intimation of the court that the defendant should recover all betterments. Asking from a court of equity relief from its own mistake, the plaintiff should be required to do equity to the one admittedly holding the legal title.

While this decision does not overrule the case of *McKenzie v. Houston,* 130 N. C., 566, which involved the construction of a deed, it is, of course, subversive of its essential principle.